1          A     Maybe once every, like, two months,

2     so --

3          Q     How  did  he  finish  up  the  school

4     year?

5          A     He  actually  was  to  be  retained.

6     When I talked to Ms. Moore at the end of the

7     school  year,  he  was  supposed  to  be  retained

8     under no means necessary.

9          Q     What do you mean by that?

10          A     Ms.  Moore  said  that,  you  know,  she

11     recommended  him  to  go  to  summer  school  and

12     even if he did complete summer school, he was

13     still not to pass to the fourth grade.

14          Q     When did she tell you that?

15          A     This  was  at  the  end  of  the  school

16     year.

17          Q     Okay.   And  so  how  did  he  end  up

18     finishing up the school year?

19          A     In  the  school  year,  he  went  on  to

20     summer  school  and  he  was  passed  to  the  fourth

21     grade.

22          Q     And  what  is  it  that  you  want  here

1    today?

2            A    I would like to perform my own

3    independent evaluations.  I want to get them

4    done myself on my own with Friendship Edison

5    paying for those evaluations.

6            Q    Why would you be willing to let

7    Friendship Edison evaluate him?

8            A    I feel I gave them ample enough

9    time to have him evaluated.  You know, I

10    submitted the proper documentation that, you

11    know, I was supposed to and I gave them ample

12    enough time.  Even after the  time had elapsed

13    the still had an opportunity to perform the

14    evaluation  before  I  had  contacted  the

15    advocacy.  So, you know, I feel that they're

16    not going to do them even if I was to say yes,

17    I'll give you permission.  I don't trust them

18    now.

19            MR. HULL:  No further questions.

20            HEARING  OFFICER  ST.  CLAIR:    Mr.

21    Dalton?

22            CROSS EXAMINATION

1          BY MR. DALTON:

2          Q    You said you met with the school

3     about every two months.  When did that start?

4          A    When?  Usually we -- from the time

5     that he had been attending the school.

6          Q    Well, with regard to the last

7     school year, do you recall when it started?

8          A    When the school year started?

9          Q    No.  When, from the beginning of

10    school, did you first start talking to the

11    school about your son's problems?

12         A    Once I got that first --

13              HEARING    OFFICER    ST.    CLAIR:

14    September 2004.

15              MR. DALTON:  Correct.

16              BY MR. DALTON:

17         Q    In  other  words,  how  soon  after

18    September or how late after September did you

19    have the first meeting with the school about

20    your son?

21         A    Two months into it after we started

22    seeing that he was --

91

1          HEARING OFFICER ST. CLAIR:  Hold

2    on.  November?

3          MR. DALTON:  No.  October 27th.

4          BY MR. DALTON:

5    Q    Does that sound about right?

6    A    I don't know the exact date.

7    Q    Well, wouldn't be that two months

8    if September was the first start of school and

9    October is the very end of the second month?

10   A    They do start school, I believe in,

11   like, the end of August.

12   Q    Right, so the end of October would

13   be two months.

14   A    Well, actually it would be on his

15   report card which stated the time --

16   Q    Well, it's on or about that time,

17   right?

18   A    Okay.  All right.

19   Q    And the reason for that is because

20   of something called the FAST (phonetic-global)

21   process, isn't it?

22   A    Yes.

1        Q    That's a free referral process,

2   correct?

3        A    Yes.

4        Q    What was your understanding of a

5   free referral process?

6        A    My understanding of the FAST

7   process is that we would get together --

8   myself, the special education teachers, the

9   entire third-grade teacher group -- and we

10  would get together and discuss possible

11  outcomes to try to help L███████.

12       Q    Right.    And by January, my

13  impression is that you felt that wasn't

14  working out and that's why --

15            MR. HULL:  Objection.

16            HEARING OFFICER ST. CLAIR:  Just a

17  minute.   Just a minute.   Rephrase your

18  question, Mr. Dalton.  Just ask her if she was

19  not satisfied.  Ask her if she was satisfied.

20            BY MR. DALTON:

21       Q    Why did you file the request for

22  evaluation?

93

1          A    We never had any FAST meeting, so -

2    -

3              MR. DALTON:   I would like that

4    answer stricken from the record as non-

5    responsive to my question.

6              BY MR. DALTON:

7          Q    My question to you, ma'am, is:  Why

8    did you file the request for evaluation?

9              HEARING OFFICER ST. CLAIR:   You

10    mean why did she give them the letter --

11              MR. DALTON:  Right.

12              HEARING OFFICER ST. CLAIR:    --

13    January 26th.

14              MS. SMITH:  Why?  Because my son

15    was failing.   Nothing was being done in

16    reference to getting him evaluated.   I've

17    asked --

18              BY MR. DALTON:

19          Q    Thank you.  Now --

20              MR. HULL:  Objection.  The witness

21    hadn't finished answering the question.

22              HEARING OFFICER ST. CLAIR:   Mr.

94

1    Dalton, I do want you to let her finish.

2                    MR. DALTON:    I thought she had.

3    I'm sorry.

4                    HEARING OFFICER ST. CLAIR:    Okay.

5    Go to the next question.

6                    MR. HULL:  Was an explanation --

7                    HEARING OFFICER ST. CLAIR:  Wait a

8    minute.  Don't talk to the witness.  Don't do

9    that, Mr. Hull.  You're totally out of line

10   right there.    Just  let  --  go  ahead,  Mr.

11   Dalton.

12                    BY MR. DALTON:

13       Q    Was  an  explanation  of  why  the

14   school  did  not  respond  to  your  request  in

15   January  given  to  you  at  the  August  2nd

16   meeting?

17       A    No.

18       Q    Are you sure?

19                    MR.  HULL:  Objection  to  continue

20   question.    August  2nd  was  the  resolution

21   meeting.

22                    HEARING  OFFICER  ST.  CLAIR:    I

95

1    understand that.  I know that, Mr. Hull, but -

2    -

3         MR. HULL:   I'm just making the

4    record, sir, I'm not trying to disrespect you.

5         HEARING OFFICER ST. CLAIR:   Tell

6    you what.   I'm going to sustain that

7    objection, Mr. Dalton.  Leave out the August

8    2nd meeting.  Go ahead, ask her any questions

9    you want after August 2nd, about anything that

10   happened during the meeting.  I don't want to

11   hear anything that happened during the August

12   2nd meeting.

13        MR. DALTON:   Objection.  I would

14   again have to proffer the record.  This goes

15   directly to the heart of our defense.

16        HEARING OFFICER ST. CLAIR:   No.

17   Mr. Dalton, the question is:  Why wasn't the

18   child evaluated within 120 days of January

19   26th.

20        MR. DALTON:   But she says she

21   doesn't trust the school, and I want to go

22   into that issue because we offered an

1    explanation and I want her to either remember

2    it or not remember it and I have the right to

3    follow that up.

4              HEARING OFFICER ST. CLAIR:  Well,

5    I'm going to let you ask her questions about

6    anything other than what happened and what was

7    said at that August 2nd meeting.

8              MR.   DALTON:    Then   I   renew   my

9    objection to my inability to put on my case.

10             HEARING OFFICER ST. CLAIR:  Well,

11   fine.  Continue with the cross examination.

12             MR. DALTON:  I am being prohibited

13   from putting on my case, and therefore, with

14   all  due  respect,  it  is  very  difficult  to

15   continue with my questioning.

16             HEARING  OFFICER ST.  CLAIR:   Sir,

17   let me just say this to you -- well, are you

18   finished with your cross examination?

19             MR. DALTON:  No, I'm not.

20             HEARING   OFFICER  ST.   CLAIR:    Go

21   ahead.  I'm listening.

22             MR.   DALTON:    I'm  asking  for  a

1    recess for five minutes.

2              HEARING OFFICER ST. CLAIR:    All

3    right.   I'm going to declare a five-minute

4    recess.   I'll tell you what.   We'll make it

5    ten minutes, Mr. Dalton.

6                        (Whereupon, a short break

7                        was taken.)

8              HEARING OFFICER ST. CLAIR:    All

9    right.  We're back on the record.  Mr. Dalton,

10   I think you were cross examining Ms. Smith.

11             BY MR. DALTON:

12        Q    Yes.   Ms. Smith, prior to the

13   August 2nd meeting, did your counsel advise

14   you that the school had made a request to

15   evaluate your son?

16             MR.  HULL:    Objection.    That's

17   attorney-client privilege.

18             MR. DALTON:  No.

19             HEARING OFFICER ST. CLAIR:   Wait,

20   wait, wait.  Did your attorney tell you that

21   an offer was made to evaluate the student?

22             MR. DALTON:  Correct.

1           HEARING OFFICER ST. CLAIR:  Just a

2    minute.    Why   is   that   attorney-client

3    privilege?

4           MR.  HULL:  He's asking about

5    conversations that I may or may not have had

6    with my client and first of all, there's not

7    relevance.  What's the relevance?  Second of

8    all, it's privileged.  It falls squarely under

9    the attorney-client privilege.

10          HEARING OFFICER ST. CLAIR:   No.

11   He's not talking -- well --

12          MR. HULL:  Yes he is.  "What did

13   your lawyer tell you?"  That what I'm saying.

14    "What did your lawyer tell you?"

15          HEARING OFFICER ST. CLAIR:  Well,

16   but he's asking about whether or not -- it's

17   not  totally  just  a  conversation  between

18   yourself and Ms. Smith, which is protected.

19          MR.  HULL:  That's what he was

20   asking about.  He can ask it differently --

21   "Were you ever made aware?"  "Were you ever

22   aware of --?"  He wants to get at a settlement

1   offer which I would object to also.

2            HEARING OFFICER ST. CLAIR:   Well,

3   just a minute.  Just a minute.

4            MR. HULL:   Also, I would object

5   because --

6            HEARING OFFICER ST. CLAIR:   Just a

7   minute.

8            MR. HULL:   I need to make a record

9   here, with all due respect.  It's beyond the

10  scope of direct examination, therefore it's

11  not allowed under cross examination.

12           HEARING OFFICER ST. CLAIR:   Okay.

13  I'm going to overrule that part of it.  Were

14  you ever aware that an offer was made --

15           MR. DALTON:   Prior to August 2nd.

16           HEARING OFFICER ST. CLAIR:   Yes.

17  To evaluate (inaudible).

18           MS. SMITH:   Yes.

19           BY MR. DALTON:

20       Q    And how were you made aware of

21  that?

22           MR. HULL:   Objection.

100

1              HEARING OFFICER ST. CLAIR:    I'm

2    going to overrule it.  Go ahead.  She's aware

3    of it; I'm going to let her answer it.    Go

4    ahead.

5              MS. SMITH:  From my attorney.

6              BY MR. DALTON:

7         Q    And what was your response to the

8    school's desire to evaluate your son?

9         A    I did not want the school to do it,

10   to perform the evaluation?

11        Q    Why?

12        A    Why?  Because I wanted him examined

13   myself.    I  wanted  it  independent  of  the

14   school.

15        Q    And were you aware that the school

16   intended to evaluate your child and have that

17   completed prior to this hearing date?

18        A    Yes.

19        Q    Were  you  also  aware  that  you  can

20   disagree with the evaluations, that you would

21   then be entitled to private evaluations?

22        A    Could you repeat it?

1          MR. HULL:  Objection.

2          HEARING OFFICER ST. CLAIR:  Because

3     that's the same question I asked her in view

4     of her right.

5          MR. DALTON:  That's correct.

6          HEARING OFFICER ST. CLAIR:  What

7     he's asking -- go ahead.

8          MR. DALTON:  No, if you have a way

9     to phrase it, that's fine.

10          HEARING OFFICER ST. CLAIR:  It is

11     that if you -- if any school does an

12     evaluation, a parent can disagree with the

13     evaluation and request an independent

14     evaluation.  At that point, the school has the

15     option of either paying for it or filing for

16     due process to establish the validity of their

17     evaluation.

18          MS. SMITH:  Right.  Okay.  Yes.

19          HEARING OFFICER ST. CLAIR:  Did I

20     state that correctly?

21          BY MR. DALTON:

22          Q    Were you aware of that?

102

1        A    Okay.  Yes.

2        Q    And  yet  you  still  did  not  the

3    school to evaluate your child?

4        A    Yes.

5        Q    Even  though  this  process  would've

6    been completed well before this hearing?

7        A    Yes.

8        Q    All right.

9            MR.  DALTON:   No  further  questions.

10    I do have two other witnesses in rebuttal to

11    this witness.

12            HEARING   OFFICER   ST.   CLAIR:

13    Redirect, Mr. Hull?

14            REDIRECT EXAMINATION

15            BY MR. HULL:

16        Q    Relating  to  one  of  the  last

17    questions that Mr. Dalton asked you, if you

18    had  tried  to  seek  --  let's  say  that  you

19    allowed the school to do the evaluations and

20    you disagreed with them, did you have money to

21    be able to pay for independent evaluation and

22    then seek reimbursement?

1          MR. DALTON:   Objection.   Not

2    relevant under the law (inaudible).

3          HEARING OFFICER ST. CLAIR:   I'm

4    going to let her answer the question.

5    Overruled.

6          BY MR. HULL:

7          Q    Did you have money to front to a

8    service provider to get these evaluations done

9    independently?

10         A    No.

11         Q    Okay.   Thank you.   Was it your

12   understanding, ma'am, that you would have to

13   pay for these evaluations once you disagreed

14   with the school's evaluations?

15         A    Was it my understanding --

16         Q    That you would have to pay for them

17   if you disagreed with our evaluations in order

18   to get your own independent --

19         MR. DALTON:   Objection.   He's

20   asking her her understanding of the law.

21         MR. HULL:  Absolutely.

22         HEARING OFFICER ST. CLAIR:   Well,

1   that's   correct   but   she   can   answer   that

2   question.   Overruled.

3             MS.  SMITH:    Repeat  the  question

4   again.

5             BY MR. HULL:

6        Q    Okay.   Did  you  think  that  you'd

7   have  to  pay  for  these  evaluations  if  you

8   though we'd messed up on the evaluations?

9        A    I  guess  if  my  complaint  wasn't

10  resolved,  then  ultimately  I  probably  would

11  have.

12       Q    So the only way you were going to

13  get these independent eval's was to come to a

14  hearing?

15       A    Correct.

16       Q    And   how   did   you   get   that

17  understanding?

18            MR. DALTON:  Objection.

19            HEARING   OFFICER   ST.   CLAIR:

20  Overruled.

21            MR. DALTON:  What's the relevance?

22            HEARING   OFFICER   ST.   CLAIR:

1    Overruled.

2            MR. HULL:  It's very relevant.

3            HEARING OFFICER ST. CLAIR:  Yes.  I

4    mean, I'm going to let him get his record.  Go

5    ahead.

6            MS.  SMITH:   Okay.   Because  it

7    states that  the  school  has  180  days  to

8    complete  the  evaluation  and  once  it's  not,

9    than the next step further is a hearing.

10           BY MR. HULL:

11       Q    Okay.  But the problem I have with

12   that, ma'am, is that this hearing --

13           HEARING OFFICER ST. CLAIR:  Ask a

14   question.  Don't --

15           BY MR. HULL:

16       Q    Didn't the Hearing Officer advise

17   you when he was reading your rights that you

18   had the absolute right to contest it?  The

19   evaluations?  And that we would have to pay

20   for them or we could take you to a hearing?

21       A    Yes.

22       Q    And you said you understood those

106

1    rights.

2        A    Yes.

3        Q    And  so  isn't  your  answer  in

4    conflict with that understanding?

5        A    Not necessarily.

6        Q    How is it not in conflict, ma'am?

7        A    Because I guess ultimately, before

8    I was thinking that the school doesn't do it,

9    doesn't  pay  for  it,  than  I  am  ultimately

10   responsible  for  trying  to  get  it  done,  so

11   therefore I had to go through a process to get

12   it  done.   So  do  you  understand  what  I'm

13   saying?

14       Q    No, I don't, ma'am.

15            MR.  DALTON:    The  question's  been

16   answered.

17            HEARING OFFICER ST. CLAIR:   Just  a

18   minute.  Another question, Mr. Hull.

19            MR. HULL:  No further questions.

20            HEARING OFFICER ST. CLAIR:   Thank

21   you, Ms. Smith.  Alright, now, the rebuttal.

22   How many witnesses?

107

1           MR. DALTON:  Two.

2           HEARING  OFFICER  ST.  CLAIR:   Have

3    you finished?

4           MR. HULL:  We're done.

5           HEARING  OFFICER  ST.  CLAIR:   All

6    right.   Now because this is rebuttal, this is

7    very narrow.

8           MR. DALTON:  Absolutely.

9           HEARING  OFFICER  ST.  CLAIR:   Who do

10   you want to call?

11          MR.  DALTON:   I  want  to  call  Ms.

12   Moore first and then Dr. Molett.

13          HEARING  OFFICER  ST.  CLAIR:   All

14   right.  Ms. Moore, I'm going to ask you change

15   seats   with   Mr.   Morris   and   direct   the

16   microphone to yourself.

17   Whereupon

18                 ANGELIC MOORE

19   was called as a witness to testify on behalf

20   of the parent and the student and was examined

21   and testified as follows:

22                DIRECT EXAMINATION

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1        BY MR. DALTON:

2        Q    Was  an  explanation  given  to  the

3    parent  of  why  the  school  did  not  respond  to

4    her January request for evaluation?

5        A    Yes, sir.

6        Q    And what was that explanation?

7        A    That there had been a transition in

8    our special ed team.  And email had been sent

9    and somewhere along the way, she either did

10   not receive it or I don't know, but that it

11   was somehow lost in the loop and that we would

12   do the evaluation.

13       Q    And  was  this  a  generalized  or  a

14   specific computer failure?

15       A    I really don't know.  I think it

16   was specific.  I really couldn't say.

17       Q    Was  there  a  generalized  computer

18   problem with the school's computer that was

19   only recently resolved?

20       A    As far as I know, yes.

21            MR. DALTON:  No further questions.

22            HEARING  OFFICER  ST.  CLAIR:    Cross

1    examination, Mr. Hull?

2                    CROSS EXAMINATION

3            BY MR. HULL:

4            Q    When did you explain this to the

5    parent?

6            A    She asked in about May, that was

7    the end of the school, and she had spoken to

8    one of the special ed teams, Mr. Johnson, and

9    I told her that there was a glitch in the

10   system.  She had left and that may be why he

11   had not been evaluated.

12           Q    Okay.  So you concede that you had

13   gotten the request to evaluate, then?

14           A    I never denied it.

15           Q    Okay.  So it wasn't until the end

16   of   May   that   the   parent   was   given   an

17   explanation as to why the evaluations had not

18   been done?

19           A    She never asked.  When I told her

20   that they would do it --

21                    HEARING  OFFICER  ST.  CLAIR:    I'm

22   going to ask you to speak up, Ms. Moore.

1            MS. MOORE:   She had never asked.

2     When I told her that she would be contacted,

3     because there was someone in that position,

4     that she would be contacted.

5            BY MR. HULL:

6        Q    Was this explanation in writing or

7     done orally?

8        A    It was verbal.

9        Q    Okay.  Thank you.

10           MR. HULL:  No further questions.

11           HEARING  OFFICER  ST.  CLAIR:    Dr.

12    Molett?

13    Whereupon

14                RHONDALYN MOLETT

15    was called as a witness to testify on behalf

16    of the parent and the student and was examined

17    and testified as follows:

18                DIRECT EXAMINATION

19           BY MR. DALTON:

20        Q    What   is   your   position   with

21    Friendship Edison?

22        A    I'm the clinical psychologist.   I

1   oversee all the mental health services for all

2   of the campuses.

3       Q   And did you act as a participant in

4   the August 2nd resolution meeting for this

5   student?

6       A   Yes, I did.

7       Q   And did you request of counsel for

8   the school that you'd be able to address the

9   parent because you had a concern that the

10  parent had a lack of understanding of this

11  process?

12          MR. HULL:  Objection.

13          HEARING   OFFICER   ST.   CLAIR:

14  Sustained.

15          MR. DALTON:  I'll need to proffer

16  the record.

17          MR.   HULL:    Objection  to  the

18  proffer.  Prejudicial.

19          HEARING   OFFICER   ST.   CLAIR:

20  Overruled.  Make your proffer.

21          MR. DALTON:  The proffer is that

22  Dr. Molett did make this request of counsel,

112

1    that Mr. Hull denied the request.  Then she

2    wrote notes --

3              HEARING OFFICER ST. CLAIR:  I don't

4    want.  Just --

5              MR. DALTON:   Okay.   Well, I just

6    want to proffer for the record that her

7    testimony that I would've had her testify to

8    at this hearing is in her notes, therefore the

9    federal district court can read those notes as

10   to what my proffer would be.

11             HEARING OFFICER ST. CLAIR:   Well,

12   that's going to be in the record.

13             MR. DALTON:  Yes.

14             HEARING OFFICER ST. CLAIR:  I mean

15   just because I struck it, it doesn't mean I

16   went outside and tore it up.

17             MR. DALTON:   I understand that.

18   She doesn't have to testify.  You won't have

19   to hear it if you --

20             HEARING OFFICER ST. CLAIR:   I'm

21   prepared to hear anything Dr. Molett has to

22   say prior to the August 2nd meeting.

113

1    MR. DALTON:    No.    I don't have
2    anything to offer.

3    HEARING OFFICER ST. CLAIR:    Well,
4    Dr. Molett, at least you were sworn in and had
5    a chance to give your name on the record.

6    DR. MOLETT:    And I'm back at my
7    original seat.

8    HEARING OFFICER ST. CLAIR:    All
9    right.    That brings us to argument.    Mr.
10   Dalton, you're going to have the first and the
11   last word.

12   MR. DALTON:    First I want to
13   apologize.    I don't normally let my emotions
14   go through on a case.

15   HEARING OFFICER ST. CLAIR:    Is that
16   to the Hearing Officer?

17   MR. DALTON: Yes, it is.

18   HEARING OFFICER ST. CLAIR:    Apology
19   accepted, sir.

20   MR. DALTON:    And to parties, and
21   that's why I requested a break, and I
22   appreciate that very much.

1          As the Hearing Officer knows, I

2    have been at this for two decades now and the

3    vast  majority  of  time  I  have  represented

4    parents.   The  new  law  gives  us  a  new

5    direction.  It gives us a new hope that these

6    matters are not as contentious as they were

7    under the old law, that they will be resolved

8    prior to a hearing.

9          It  is  my  firm  opinion  that  there

10   has been an abuse in this case.  My parent's

11   counsel  of  the  new  law  and  its  intent,  and

12   that is the only explanation I offer.

13          HEARING OFFICER ST. CLAIR:  Is that

14   it?

15          MR. DALTON:  No.  I want to go on.

16          HEARING  OFFICER  ST.  CLAIR:   I'll

17   tell you what.

18          MR.  DALTON:   About  that  subject,

19   it's it.

20          HEARING  OFFICER  ST.  CLAIR:   Yes,

21   but I tell you what.  Whether or not that's

22   happened   can   be   addressed   after   my

1    determination and any fee litigation and then

2    the notes will come in.

3                    MR. DALTON:   Well, I'm ready to

4    move on.

5                    HEARING OFFICER ST. CLAIR:   Okay.

6    Move on, please.

7                    MR. DALTON:   This is a situation

8    where  the  school  never  contested  that  we,

9    albeit  not  through  any  fault,  but  albeit  we

10   did  not  within  the  proper  time  frame  evaluate

11   this  child,  but  we've  never  contested  that

12   matter.

13                   HEARING  OFFICER  ST.  CLAIR:   Just

14   speak to me.

15                   MR. DALTON:   Okay.  And we offered,

16   not  once,  but  twice,  to  evaluate  this  child

17   and  to  evaluate  the  child  within  the  time

18   frame  prior  to  this  hearing,  and  offered  a

19   remedy of independent evaluations if we didn't

20   do  it,  all  before  the  date  of  this  hearing.

21   And  therefore,  we're  entitled  to  a  directive

22   finding  that  there  was  not  a  denial  of  faith

116

1   even though we did not meet the time line,

2   given these unique facts.

3           HEARING OFFICER ST. CLAIR:    The

4   computer.

5           MR. DALTON:    No, no, no.    The

6   unique facts that on July 28th we offered to

7   evaluate the child, to August 2nd we offered

8   to evaluate the child, and we offered to

9   complete the evaluations by September 2nd, and

10  we offered independent evaluations if we

11  didn't, all of which would've been completed

12  prior to today's hearing.    That is why we are

13  (inaudible).

14          HEARING OFFICER ST. CLAIR:    All

15  right.    I finally got your offer then.    Okay.

16  Finish, Mr. Dalton.

17          MR. DALTON:    Okay.    I want to point

18  out something on page 3 of the school's

19  Exhibit Number 1 which we didn't object to the

20  admission.    It's the answer here that's

21  required under the new law, and in it they're

22  supposed to state their position as to our

1 || allegation.

2 ||             And it's very interesting that

3 || they're making it up as they go along, Mr. St.

4 || Clair, and this is what bothers me here. In

5 || their answer they denied that --

6 ||             HEARING OFFICER ST. CLAIR:   What

7 || paragraph?

8 ||             MR. DALTON:   Paragraph number 8

9 || regarding the January 26th written request,

10 || they said -- and their attorney signed off on

11 || it -- that they denied that the written

12 || request was ever provided to the parent as

13 || alleged in paragraph 8 of our complaint.

14 ||             You just heard Ms. Moore say that

15 || she did not deny that she had received the

16 || January 26th letter, as we have stated.   So

17 || already the story's changing from the answer

18 || to what they've presented here.

19 ||             Now we're hearing about a computer

20 || glitch --  I challenge anyone in this room to

21 || show me anywhere in this answer there's any

22 || mention of a computer glitch -- as their

1   excuse.  The law requires them to file an

2   answer stating why they acted or did not act,

3   the reasons therefore, and the different paths

4   that they considered in reaching that

5   decision.

6   So it doesn't just ask them to say

7   yes, we'll do it or no, we won't, and it asks

8   them to give background and reason and that's

9   what this answer was filed on, under that

10  provision, and they cite to that provision

11  themselves in this document, yet there's

12  nothing about the computer glitch.  Yet now,

13  we're hearing for the first time about a

14  computer glitch.  I would say that goes to the

15  credibility of the witness.

16  Moreover, computer glitch or no

17  computer glitch, the fact is --

18  HEARING OFFICER ST. CLAIR:  You

19  mean you want me to accept a (inaudible).

20  MR. DALTON:  No, I don't want you

21  to believe, whether or not there was a

22  computer glitch I think is irrelevant, but I

1   question whether that's even true -- why isn't

2   that in their answer.   Just compare their

3   testimony to what they answer here, in

4   writing.

5           So what's going on here?  As I said

6   before, they're making it up as they go along.

7   They're doing anything because they wanted to

8   make this a hearing about resolution, not a

9   hearing about what actually happened -- the

10  actual heart of the matter, the allegations

11  that we brought in.

12          And those allegations are that on

13  January 26th it's undisputed that the parent

14  provided the teach with the request to

15  evaluate.  A very good request, actually, that

16  I'm thinking of adopting it to the ones we use

17  in our office because it sets forward

18  everything that's necessary.

19          It was provided to the teacher and

20  the teacher may or may not have forwarded it

21  on to the appropriate people, but the point is

22  the evaluations were not done and why should

120

1    this child pay the price for that.  The parent

2    had an ongoing dialog, meeting at the school

3    every couple months.  She was at, inquiring

4    about the request for evaluation.  She did not

5    hire a lawyer and get the due process going

6    until after more than four months had gone by.

7     We didn't file this until July 15th under the

8    new law.  We filed it when the 120 days had

9    first run than, you know, under the old law we

10   wouldn't have been here as long because there

11   wouldn't be any resolution issues to deal

12   with.

13           But so what happens?  The parent

14   goes to the resolution conference.  We're not

15   going to get into that.  He hasn't been

16   evaluated, the parent wants independent

17   evaluations.  Your role here, I would submit

18   to you with all due respect, is to decide if

19   they violated the parent and student's rights

20   by not evaluating within 120 days of the

21   request.  We believe that that was a violation

22   of the parent's rights, it was a denial of

1    faith.

2              I'd like to point out, we've

3    included the report cards in our disclosure,

4    and I'd ask you after we're done here that you

5    look very carefully at these grades. This

6    isn't a student who is doing okay and parent

7    is just being capricious by asking for these

8    evaluations and putting a drain on the system.

9              No, this is a student who is

10   struggling academically and has been

11   struggling through most of the school year.

12   He managed to get promoted to the fourth

13   grade, but nevertheless, the report card

14   speaks for itself.

15             So what are we asking? One issue

16   that we raised in our complaint was after the

17   parent gave this letter to the school

18   representative, the school had an obligation

19   under the statute to provide in writing a

20   notice as to whether or not they were going to

21   comply with the parent's request. That was

22   never done; that's another violation of the

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1   parent's rights.

2           Okay.  To get to my point, what is

3   it that we want?  We want you to order, and

4   it's listed in our -- I'll defer to our

5   hearing request.  Our relief is there and I'd

6   ask  that  you  just  follow  what's  in  there

7   paragraph for paragraph.  Thank you.

8           HEARING  OFFICER  ST. CLAIR:   Thank

9   you.  Last word, Mr. Hull?

10          MR. HULL:  With regard to the issue

11  raised  about  the  report  cards,  the  mother

12  confirms that the child was in a pre-referral

13  process   by   October,   so   we   didn't   even

14  (inaudible).

15          With   regard   to   the   issue   being

16  whether we violated the 120 days, that's not

17  an issue because we already conceded to that.

18   I believe the Hearing Officer knows what the

19  issue in this case is.

20          HEARING  OFFICER  ST. CLAIR:   Ladies

21  and gentlemen, I want to thank you for your

22  attention  and  your  patience.   I  know  this

123

1    hasn't been a pleasant gathering, but I want

2    to thank everyone.   The record is closed.

3    Give the Hearing Officer ten days.   Thank you.

4                    (Whereupon the foregoing matter was

5    adjourned.)

6

7

8

9

10

11

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.

(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com